192 So.2d 472

Adolphus **WHITTAKER**

**v.**

**STATE.**

**I Div. 140.**

Court of Appeals of Alabama.

Nov. 22, 1966.

---

**466**

Bert S. Nettles, Mobile, for appellant.

Richmond M. Flowers, Atty. Gen., and Jas. H. Evans, Asst. Atty. Gen., for the State.

JOHNSON, Judge.

Appellant was indicted by the Grand Jury of Mobile County, Alabama, on two counts of indecent molestation of Robert Leon Wilson, a male child, who at the time of the alleged act was under the age of sixteen years

On September 27, 1965, the appellant appeared in open court with his attorney and entered a plea of not guilty. Appellant's first attorney entered a motion to withdraw his appearance and the motion was granted. Whereupon the court appointed another attorney who was relieved of his duty upon oral motion. The court then appointed appellant's present attorney and a plea of not guilty was filed to each count of the indictment.

After a trial by jury, appellant was found guilty as charged and sentenced by the court to a term of five years in the penitentiary. It is from the judgment of the court imposing this sentence that this appeal is made. The trial judge refused to give appellant's requested written charges Nos. 1, 3, 4, 7, 8, 9, 10, 11 and appellant's requested charge "A". Appellant filed a motion for the court to appoint an attorney to represent him in this appeal and requested that he be furnished with a transcript of the evidence, which motion was granted by the court.

The tendency of the evidence presented by the State through witness Robert Leon Wilson, age 11, of Mobile County, Alabama, is that he was enticed by appellant into a room in a house and that appellant "came in the room and locked the door, and then he came back in there with a hammer * * *

he said he would give me 50 cents and then he said 50 cents was too much and that he would give me a quarter * * * he made me scared * * * he told me if I didn't pull my pants down he was going to make me do it * * * he said he was going to hit me in the head with that hammer * * he made me pull down my pants and lay on the bed * * * he greased hisself and got on top of me * * * he started going up and down." Robert stated that he told his sisters about the incident that night and that one of them told his mother who took him to a doctor. He stated that he had since then seen appellant "walking down the street" and had identified him in a police line-up.

On cross-examination, Robert Leon Wilson stated that he had never seen appellant before the incident, which occurred at about 9:00 A.M. on a Sunday; that after the incident, his daddy and his brother took him to appellant's house and he further testified, "I seen his face in the door" and that he saw his brother talking to appellant. When asked how he described appellant to his family, he replied that he said, "he had a moustache on him."

Next, Robert's thirteen year old sister testified that on a Sunday last year, her brother told her what had happened to him and that she told her mother.

Robert's brother, Felix Wilson, Jr., testified that some time after Christmas last year, on a Sunday, he received a report that something had happened to his brother, and that night his brother directed him to appellant's house; and that appellant came to the door and said, "My brother went to crying about that was him". Felix stated that he then got the police and that when he and the police returned, appellant was gone.

On cross-examination, Felix testified that on the Sunday in question his brother had been crying because "he was scared to tell him" and that he was crying "because he didn't want to go" with him to appellant's house. When asked if he knew Joe Louis

Walker, Felix replied that he knew a "Joe Louis" but he did not know his last name or where he lived and that it could have been a year or more since he had seen him. Felix described this person as being young and probably a little shorter than he but stated that he did not recall whether or not he wore a moustache.

Robert's mother, Reuther L. Wilson, testified that during March of last year her son had complained that something had been done to him and that she had sent for her son, Felix, and carried Robert to the Mobile General Hospital where he was examined and that after the examination she took care of him. She testified that she did not examine him herself. When asked if there were any pains or troubles, she replied, "Not that I know of."

On cross-examination, Robert's mother stated that the boy was very much upset, was crying, scared and did not want to tell her what had happened, nor did he want to show his brother, Felix, where the man lived.

The State's last witness was Officer William Mingus who testified that Robert Leon Wilson had picked appellant from a police line-up.

Appellant then testified in his own behalf that he was nineteen years old and lived with his mother and "another fellow named Joe Louis Walker" who was about twenty and had been residing there for about six or seven months. Appellant said that Joe Louis was not kin to him but was "a friend of my step-daddy's". He also said that his grandmother who lived about three blocks away had helped take care of him.

Appellant stated that on the Sunday in question, he arose at about 8:00; that no one was in the house but Joe Louis who was still sleeping when appellant left the house at 8:30; that he then visited at the house of a friend by the name of George Washington; and that he arrived at his grandmother's house at about 9:00 that morning.

Here he said he watched a colored church program on his grandmother's set; went "to the store to get some change for his grandmother"; and then went to see Rosie Lee McKinney, age twenty, and the mother of his two year old child. He stated that he returned to his mother's house at about 9:30 that night and when he arrived Joe Louis was not there and that he hadn't seen him since. He then started watching television at his mother's house when a little boy and a man came to his front door.

Appellant described Joe Louis as being about his size and said that Joe Louis "is just a little bit heavier than I is and he is got a moustache that comes down all the way down, and a goatbill that comes down and * * * about 145 pounds". Appellant stated that in March of last year he was not wearing a moustache and that his employer, Providence Hospital, would not allow him to wear a moustache.

Appellant's mother, Ernestine Ormond, testified that appellant and a boy by the name of Joe Louis Walker were living with her at the time in question, that Joe Louis Walker had a moustache and that he always wore one, but that her son (appellant) had never worn a moustache. She further stated that when she left the house at 7:30 on the morning in question, appellant and Joe Louis Walker were both asleep, that she did not see appellant again until about 8:00 or 8:30 that night, and that she had not seen Joe Louis from that time until the following Christmas Eve night. She stated that Joe Louis wore her son's shirts and some of his pants.

On cross-examination, appellant's mother stated that Joe Louis was not too much taller than her son and that they wore the same size clothes. When asked where Joe Louis was now, she answered, "I understand they have him in jail."

Next, appellant's grandmother testified that appellant had come to her house before 9:30 on that Sunday morning and that "he didn't act like nothing was wrong" nor did he appear to be "excited". She stated that she had never seen appellant with a moustache and "he ain't never wore no moustache".

Counsel for appellant contends that the trial court erred in its refusal to give appellant's requested Charges Nos. 1, 8 and 11.

Refused Charge No. 1 is as follows:

"1. I charge you, gentlemen of the jury, that the humane provision of the law is that there should not be a conviction upon the evidence, unless to a moral certainty it excludes every other reasonable hypothesis than that of the guilt of the accused. No matter how strong may be the facts, if they can be reconciled with the theory that some other person may have done the acts, then the guilt of the accused is not shown by that full measure of proof which the law requires, and you should find the defendant not guilty."

█ In Bohlman v. State, 135 Ala. 45, 33 So. 44, the court disapproved a written instruction which contained the expression, "humane provision of the law". See Richardson v. State, 37 Ala.App. 194, 65 So.2d 715, which follows the decision in the *Bohlman* case. Therefore, there was no error in refusing appellant's written requested instruction No. 1.

The court refused to give appellant's written requested Charge No. 8, which reads as follows:

"8. I charge you, gentlemen of the jury, that a person should not be convicted unless the evidence excludes to a moral certainty every reasonable hypothesis but that of his guilt. No matter how strong may be the circumstances they do not come up to the full measure of proof which is required by the law if they can be reasonably reconciled with the theory that the accused is innocent."

The following instructions given at the request of appellant were:

"2. The court charges the jury that defendant cannot be convicted in this case

unless each and every juror is not only reasonably satisfied from the evidence of defendant's guilt, but is satisfied from the evidence alone, beyond all reasonable doubt, and to a moral certainty, of his guilt."

"5. If you have a reasonable doubt of defendant's guilt growing out of the evidence or any part of it, you must acquit him."

"6. The court charges the jury that the innocence of the defendant is presumed until his guilt is established by the evidence in all the material aspects of the case beyond a reasonable doubt, to a moral certainty, and it may also be said that evidence of guilt must be strong and cogent, and, unless it is so strong and cogent as to show that defendant is guilty to a moral certainty, defendant should be acquitted."

■ The appellant's refused instruction No. 8 was covered by the instruction Nos. 2, 5 and 6 and by that part of the court's oral instruction which related to reasonable doubt.

The court refused to give appellant's requested instruction No. 11 which reads as follows:

"I charge you, gentlemen of the jury that in this case as in all criminal cases the defendant is presumed innocent until proven guilty and that if by any reasonable construction of the evidence in this case some one other than the defendant could have or might have done the things of which the defendant is charged, then it is your duty to give the defendant the benefit of the doubt and find him not guilty."

The substance of this instruction was not covered by the court's oral instruction. In Spraggins v. State, 139 Ala. 93, 35 So. 1000, the court held that it was reversible error to refuse the following instruction:

"The court charges the jury a probability that some other person may have done the shooting is sufficient to create a reasonable doubt of the guilt of the defendant, therefore for his acquittal."

■ In Pitman v. State, 148 Ala. 612, 42 So. 993, the court held that such a charge is proper where there is evidence pointing to one or more persons other than the defendant. There was evidence given by appellant, his mother and his grandmother that Joe Louis Walker was living with appellant and appellant's mother at the time in question; that Joe Louis Walker and appellant were about the same size; that appellant left his mother's house about thirty minutes before the crime was committed at the house and that Joe Louis Walker was at the house when appellant left; that Joe Louis Walker was not seen for several months after the day of the crime; that the victim, in referring to the person who had committed the act, stated that "he had a moustache on him"; and there was testimony that appellant never wore a moustache; that Joe Louis Walker was wearing a moustache on the date of the alleged offense. The evidence is sufficient to point guilt at Joe Louis Walker and, therefore, instruction No. 11 should have been given.

This cause is due to be and the same is hereby

Reversed and remanded.

PRICE, P. J., dissents.